IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

JOHN HENRY CLURSKY #1232382   §

v.   §   CIVIL ACTION NO. 6:07cv404

VICKIE L. WATSON, ET AL.   §

MEMORANDUM OPINION AND ORDER OF DISMISSAL

  The Plaintiff John Clursky, proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violation of his constitutional rights.  The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment pursuant to 28 U.S.C. §636(c).  As Defendants, Clursky named Vickie Watson, a unit grievance coordinator; Merritt Stinson, the warehouse supervisor and necessities manager; Chanieka Wilson, a unit counselor; Lt. Francis Potier; Dennis Godwin, chief of security at the Moore Unit; Neva Yarbrough, warden of the Moore Unit; unit physician Dr. James Gray; correctional officer Sandra Rollins; and Kathy Beck, another unit counselor.

  An evidentiary hearing was conducted on January 9, 2008, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).  At this hearing and in his complaint, Clursky stated that he is confined at the Moore Unit of TDCJ-CID.  On March 31, 2007, he requested new boots, but he received "the same old boots," which he said had mold and mildew inside and a hole in the bottom.  He says that when he cleaned the showers, water would get in the bottom, and so he requested new boots; while Officer Stinson did not give him new boots, Clursky said, he did get a pair of rubber boots for cleaning the showers.

  On April 18, 2007, Clursky says that he filed a grievance asking for new boots, but on May 9, Stinson refused this request.  Clursky filed another request on May 17, and the next day, Stinson called him in and issued him some old shoes.  Clursky says that Stinson told him that he was going

1

to recondition the boots which the officer had previously given to him, but after he had done so, the boots caused Clursky's feet to burn and itch.  He testified that the rubber boots also made his feet burn and itch, and so he got medication for athlete's foot from the infirmary.

Clursky said that Stinson told him that he would wash and dry Clursky's boots and give them back to him, but he did not do so; instead, the boots were in the same condition that they had been in previously.  Clursky says that he refused to wear the boots and, and or around May 21, 2007, he wore shower shoes to the chow hall.  When he did so, he says, he was pulled out of line and told by Stinson to go back to his cell and put on his boots.  He asked Wilson about getting a sack meal but she said no, he would have to put on his boots to eat.  Clursky says that he missed that meal entirely and had to "go to rank," but that he did get to eat that evening.  He notes that he was told that to wear shower shoes to chow, he had to have permission from the medical department.

On May 22, Clursky says that he filed a Step Two grievance appeal, and received notification that a 35-day extension was needed for investigation.  On June 26, Vickie Watson called Clursky to her office to investigate the boots; however, Clursky says, Watson just "looked at them and wrote down her statement."  Clursky tried to tell her that the boots were not being sanitized, and complained in his grievance that there was no proof that the boots were being sanitized, but to no avail.

Clursky stated that he was suing Watson because she looked at the boots and said that they were in good condition when they were not.  He said that Stinson gave him the boots in bad condition and would not let him eat on May 21 when he was wearing shower shoes.  Clursky added that Lt. Potier also would not let him eat on that day,

According to Clursky, Dennis Godwin ordered him to wear his boots for the evening meal on May 21.  He said that Godwin had "retaliated" against him,  explaining that Godwin would not let him get copies of his legal work and so he sent the papers to his family for copies; the mailroom clerk read his mail and told Godwin about it, and since then, Clursky says, his mail has been read and interfered with in some unspecified way.  In addition, Clursky said that he has been "accused

of making phone calls which he did not make."  Clursky says that Godwin reads his mail and once asked him about a letter which Clursky had written to his cousin; he said that Godwin asked him if his cousin were male or female.  He also indicated that Godwin had refused to allow him to make phone calls and that, as a supervisor, Godwin was involved in the denial of his boots.  Clursky stated that Godwin told him that there was nothing wrong with the boots and that he did not want to see Clursky wearing shower shoes in the hall.

Clursky says that Neva Yarbrough, the unit warden, told him that there was nothing wrong with the boots even though she did not look at them.  She also said that she did not want to see Clursky wearing shower shoes in the hall.  He said that it was her job to see that he had proper footwear.

Clursky further said that Sonya Rollins went through his locker, apparently as an act of retaliation for the grievances which he had filed.  He conceded that he was searched all the time, but said "not like that."  He said that she "went through his stuff and took stuff," and that she cursed at him and asked about his grievances.  Although this search took place in August, Clursky maintained that it was connected to the problems which he had experienced in May.

Next, Clursky said that he sent an I-60 inmate request form to Kathy Beck to ask her about the cleaning chemicals and the "material safety data sheet."  He says that Beck did not answer his I-60, but instead came to the law library and yelled at him about using her first name in the request, saying that she would not answer him if he did that.  She also said that to get the information he wanted, he should talk to Stinson.

Finally, Clursky says, Dr. Gray did not inspect the boots to find out what chemical had been used to sanitize them, and did not help him to get new boots.  Instead, he says, the doctor only gave him foot cream, which he says "denied him professional medical help."

Clursky attached various TDCJ records to his complaint.  His Step One grievance says that on March 31, he requested new boots and was given a lay-in, but Stinson refused to give him new boots.  Instead, the pair he got was "an old used pair," and it was torn on the bottom just like his old

ones.  He took them back and Stinson gave him another pair, but these were torn around the top; Clursky pointed this out, and Stinson replied that "it was the best he could do."  On April 16, Clursky put in another request for new boots because his feet got wet when he worked in the shower. The response to this grievance was that there was no evidence to substantiate Clursky's allegations and that Stinson had not acted improperly by giving him old boots which had been sanitized, TDCJ policy did not state that boots issued had to be new, and boots were issued for use in cleaning the showers.

Clursky then filed a Step Two grievance saying that the boots issued to him had "holes under the soles" and "stink with mildew and mold," and cause his feet to get wet.  He says that this is unsanitary and "allows germs on my socks and feet." He says that Stinson called him into Wilson's office and gave him an old pair of shoes to wear, saying that this was only temporary until he could get the boots reconditioned.

Clursky says that he wore these shoes around the unit all weekend and then on Monday morning, Stinson called him in and gave him the boots back, saying that he had washed and dried them, apparently with a cleaning solution called Triple Play.  However, Clursky says, they were in the same condition that they had been in previously, and Stinson said that he could not do anything about the holes.  He says that Wilson and Stinson told him to take the boots and wear them, and "if my feet get wet it will be on me."  Clursky also states that Wilson told Stinson that if Clursky wrote him up, he should bring it to her and she would "stop it from going through."  Clursky says that he was ordered to stay away from water with the boots on and so he had to wear shower shoes, but when he wore shower shoes to the chow hall, Stinson made him go back to his pod, and Wilson refused to give him a sack meal.  When he complained to Lt. Potier, the officer told him to go back to his pod and that "you know what you need to do."

Clursky says that he complained to the unit manager, Jerry Stencil, and Stencil said to check back that evening.  Later, Stinson and Wilson called him to the supply room and took his boots. Stinson showed them to Stencil and then threw another pair of boots at Clursky, telling him to "take

4

them or refuse them." Clursky says that he refused the boots because they "smelled like athlete's feet" and because throwing the boots at him was inappropriate. He says that he was ordered by Chief Driskell to wear them, but that "they stink when he takes them off," causing him to develop athlete's foot. The response to this grievance was that an investigation showed that his allegations were addressed by the Step One grievance; Clursky received boots on May 21 and these were determined to be in good condition by Watson and Wilson, so no further action was warranted.

Clursky also attaches a copy of an I-60 inmate request form which he sent to the warden on May 21, complaining about being denied a meal because his boots were not fit to wear. The response to this grievance was that shoes must be worn to chow and that Clursky could either buy a pair of shoes or wear the ones issued to him; he wanted a brand new pair, which the warden said is "not your choice."

On April 16, 2007, Clursky sent an I-60 form asking for "a new pair of dry shoes" because his boots get wet inside and he needs to keep his feet dry. The response was that there are or should be rubber boots issued to clean the showers, and that he should dry his boots out and they  will be fine. On May 17, Clursky sent another I-60 complaining that his boots were leaking from the bottom and that there was some mold and mildew on the inside. The response was that Stinson would recondition his boots and dry them out, that he found no mold or mildew, and that Clursky would receive temporary shoes until Monday.

The TDCJ grievance records show that Clursky also filed a Step One grievance on May 22 complaining about being denied a meal. The response was that Clursky could not wear shower shoes in the hall without a medical pass, and that he was not denied a meal; rather, he chose not to comply with TDCJ rules, and that he was offered boots, which were appropriate footwear. Clursky filed a Step Two appeal complaining about being denied food, and was told that he had presented no new evidence and had been advised properly at the Step One level.

On August 10, 2007, Clursky filed a grievance complaining about the search of his locker by Rollins. He says that Rollins took a number of items, including hair gel, two pencils, 33 stamps,

5

two stamped envelopes, three ink pens, two handkerchiefs, two bags of coffee, two deodorants, some shampoo, and some unspecified legal papers.  He says that he thinks that Rollins has a "grudge" against him for filing a grievance against Stinson and Potier for not feeding him back in May, but does not indicate why he thinks this.  He also said that he thinks that Rollins acted in retaliation because when he tried to talk to her about what was happening, she "caught an attitude" with him, telling him that officers have the right to read legal mail and legal papers and to take whatever they want because he should have had a legal box to store his legal property in.  The response to this grievance was that inmates may be searched at any time, and that the search did not violate policy nor was it done in retaliation.  In addition, the response says that there is no evidence that officers took the property which Clursky says is missing.

Clursky filed a Step Two appeal on August 29, eight days after signing the complaint form in this lawsuit, again listing the property which he says was taken and saying that after he filed the Step One grievance, Rollins asked him "what's up on that funky little grievance you wrote?" He says that Rollins got into an argument with his cellmate and did not give him any confiscation papers for his property.  The response was that there is no evidence that the agency is responsible for Clursky's missing items and that a statement from the searching officer indicated that she did not take anything during the search, and so no replacement or monetary compensation would be offered.  In addition, the response said, an investigation found no evidence of harassment or retaliation.

Clursky's medical records show that on June 29, 2007, he filed a sick call request complaining of athlete's foot.  On examination, slight scaling was noted to the bottom of his feet, but no redness, open areas, or drainage, and he was given anti-fungal cream. He continued to complain of this problem on a monthly basis, and received renewals of the cream.  On November 23, the medical staff again noted slight scaling, with no redness, open areas, or drainage.

Warden Pratt, a TDCJ-CID warden who was present at the <u>Spears</u> hearing, testified that under TDCJ policy, inmates could not go to chow wearing shower shoes unless they had a medical pass to do so.  He stated that boots were generally issued as new and not re-used, although

sometimes boots could be re-used if they were in good condition.  Nurse Barbara Hughes, a correctional nurse present at the <u>Spears</u> hearing, stated that Clursky had been seen many times and that he had athlete's foot, which she said is "very common."

<u>Legal Standards and Analysis</u>

Clursky's primary complaint concerns his boots.  The Supreme Court has held that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...
>
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

<u>Farmer v. Brennan</u>, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994); *see* <u>Reeves v. Collins</u>, 27 F.3d 174, 176 (5th Cir. 1994).

However, a claim of negligence alone is insufficient to state a valid civil rights claim under 42 U.S.C. §1983.  The Supreme Court has stated that the Due Process Clause of the Fourteenth Amendment is not implicated by a negligent act of an official causing unintended injury to life, liberty, or property.  <u>Daniels v. Williams</u>, 474 U.S. 327, 331-33 (1986).  Complaints by prisoners for negligence on the part of prison officials, even where serious injury occurs, do not set out a valid claim under the Civil Rights Act even if such complaints could be valid under state law.  *See* <u>Bowie v. Procunier</u>, 808 F.2d 1142 (5th Cir. 1987).

In this case, Clursky has failed to show that any of the Defendants were deliberately indifferent to his safety with regard to his boots.  He says that several officers inspected his boots and told him that there was nothing wrong with them, and that the boots at one point were cleaned with a cleaning chemical, although Clursky indicated that this chemical irritated his feet.  Clursky also stated that he was given rubber boots with which to clean the shower.  Even if the Defendants were negligent with regard to Clursky's need for proper footwear or the condition of the boots which he was given, he has not shown that they were deliberately indifferent to his safety.  *Compare*

7

Domino v, TDCJ-ID, 239 F.3d 752, 756  (5th Cir. 2001) (in the medical context, inmate plaintiff alleging deliberate indifference must show that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs"); Bowie, 808 F.2d at 1142 (failure to provide proper eyewear, resulting in an inmate's losing an eye while chopping wood, was not deliberate indifference to the inmate's safety).  His claim regarding the failure to provide proper footwear is without merit.

Clursky also complains that he was made to miss a meal because he wore his shower shoes in the hall.  As noted above, TDCJ policy specified that inmates could not wear shower shoes in the hall unless they had a medical pass to do so.

In Talib v. Gilley, 138 F.3d 211, 214 (5th Cir. 1998), an inmate alleged that he was deprived of approximately 50 meals over a five-month period when he refused to comply with TDCJ procedures requiring inmates in administrative segregation to kneel at the back of their cells when their food trays were brought.  The district court held that the instructions of the defendant, Sgt. Gilley, were consistent with prison regulations that in turn were reasonably related to a legitimate penological interest, and dismissed Talib's lawsuit.

On appeal, the Fifth Circuit stated first that it was "doubtful" that Talib had been deprived of the minimal measures of life's necessities, given that he had missed only about one out of every nine meals over a five-month period.  Even assuming that such a showing had been made, however, the Court went on to state that the legitimacy and necessity of considering the State's interest in prison safety and security is well-established.  The Fifth Circuit said that courts are "ill-equipped" to deal with the increasingly urgent problems of prison administration and reform, and that prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating the inmates placed in their custody, to the extent that human nature and available resources would allow.  The Court also concluded that the regulation was based on a legitimate penological interest and so was not improper.

In the present case, it is clear that Clursky was not deprived of the minimal measures of life's necessities; he missed *one* meal, on one occasion, because he wore shower shoes in the hall.  As a general rule, being deprived of one or two meals is not cruel and unusual punishment.  *See* Moss v. Ward, 450 F.Supp. 591, 596 (W.D.N.Y. 1978); *accord*, Talib, 138 F.3d at 214 (inmate deprived of some 50 meals over five months; Fifth Circuit stated that it was "doubtful" that he was deprived of the minimal measures of life's necessities).  The indicia of confinement constituting cruel and unusual punishment include wanton and unnecessary infliction of pain, conditions grossly disproportionate to the severity of the crime warranting imprisonment, and the deprivation of the minimal civilized measures of life's necessities.  Wilson v. Lynaugh, 878 F.2d 846, 848 (5th Cir.), *cert. denied* 493 U.S. 969 (1989).  The Supreme Court has held, however, that to the extent that prison conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.  Rhodes v. Chapman, 452 U.S. 337, 346-7 (1981).  In this case, the deprivation of a single meal on a single occasion simply does not rise to the level of a constitutional deprivation.  Clursky's claim on this point is without merit.

 Clursky also appears to allege retaliation claim against Rollins, for searching his locker and taking his property, and Godwin, for reading his mail and accusing him of making phone calls which he did not make.  He also makes general references to retaliation by the other Defendants in the lawsuit.  As a general rule, a prisoner who asserts a retaliation claim must assert specific facts, mere conclusory allegations are not enough.  Whittington v. Lynaugh, 842 F.2d 818, 820 (5th Cir. 1988); Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988).

The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred.  Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997)*; see also* Jones v. Greninger,  188 F.3d 322, 325-26  (5th Cir. 1999)  This requirement places a heavy burden upon inmates, because mere conclusory allegations will

not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred.  Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation.  Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995).

In Jones v. Greninger, the Fifth Circuit explained that if the inmate was unable to point to a specific constitutional right that was violated, the claim would fail.  In that case, inmate Jones complained that he was retaliated against for filing grievances, and the retaliation took the form of limiting his right of access to court.  This limitation involved a transfer to work in food service, so his legal research time would be limited to five hours per week.  The Fifth Circuit held that there was no constitutional violation inherent in a limitation of law library access time to five hours per week; consequently, the Court said, because Jones had failed to show that the Defendants had engaged in conduct that will result in a violation of his right of access to court, his retaliation claim fails.  Jones, 188 F.3d at 326.

Similarly, in Tighe v. Wall, 100 F.3d 41 (5th Cir. 1996), inmate Thomas Tighe was assigned to the job of "inmate counsel substitute."  He was removed from this job for unsatisfactory job performance, and the warden later filed an affidavit saying that he believed Tighe had improperly called the family of an inmate about allegations of physical abuse within the prison.  Tighe contended that his dismissal from the job was in retaliation for providing legal assistance to fellow inmates, apparently in the form of making the call to the other inmate's family.

The Fifth Circuit held that to survive summary judgment, Tighe must allege a violation of a constitutional right and demonstrate a retaliatory motive.  Although Tighe argued that his First Amendment right of free speech included the right to give legal assistance to fellow inmates, and that he was removed from his job as inmate counsel and transferred to another prison in retaliation for exercising this right, the Fifth Circuit disagreed.

Instead, the Court held that prisoners have no constitutionally protected interest in a particular facility or a specific work assignment.  The Court cited an Eighth Circuit case, <u>Gassler v. Rayl</u>, 862 F.2d 706 (8th Cir. 1988) as saying that the transfer of a prisoner for writ-writing does not in and of itself constitute the violation of a protected right, and said that Tighe's argument that prisoners had been deprived of his legal assistance was without merit because prisoners have no right to a particular inmate's help in legal matters, so long as the putative recipient's right of access to the courts is not infringed.  Consequently, the Fifth Circuit concluded that Tighe had failed to show the violation of a constitutional right, and so his retaliation claim failed.  <u>Tighe</u>, 100 F.3d at 43.

In this case, the alleged retaliation of which Clursky complains by Rollins involved a search of his locker and the taking of some property.  He has no right of privacy in his locker, *see* <u>Allen v. Fuselier</u>, 273 F.3d 393 (5th Cir., August 7, 2001) (unpublished), *citing* <u>Valencia v. Wiggins</u>, 981 F.2d 1440, 1444 (5th Cir. 1993), and so the search did not violate his constitutional rights.  The taking of his personal property did not violate the Constitution because Clursky has an adequate post-deprivation remedy through the state courts or the administrative procedures of TDCJ-CID. <u>Murphy v. Collins</u>, 26 F.3d 541, 543-44 (5th Cir. 1994; <u>Simmons v. Poppell</u>, 837 F.2d 1243,  1244 (5th Cir. 1987).  Nor has Clursky shown a constitutional violation in the taking of the documents which he refers to as "legal papers," because he has not shown that the confiscation of these documents worked an actual impediment to his right of access to court.  <u>Lewis v. Casey</u>, 116 S.Ct. 2174, 2179-81 (1996) (actual harm must be shown to establish a violation of the right of access to court); *accord*, <u>Mann v. Smith</u>, 796 F.2d 79, 83 (5th Cir. 1986).  Because Clursky has failed to show a constitutional violation, his claim on this point is without merit.[1]

---

[1]Clursky says that Rollins asked him "what's up with that funky grievance that you wrote?" However, this question was asked on August 17, after the locker search, and just four days before Clursky signed the lawsuit in this case.  He has not shown that Rollins took any action against him in retaliation for his filing of the August 10 grievance against her, much less that he has exhausted his administrative remedies on any such claim.

Similarly, Clursky's retaliation claim against Godwin concerns the reading of his mail and an accusation concerning phone calls.  The fact that prison officials read non-legal mail is not a constitutional violation.  Guajardo v. Estelle, 580 F.2d 748, 756-57 (5th Cir. 1978); Freeze v. Griffith, 849 F.2d 172, 175 (5th Cir. 1988).  Nor does the fact that Godwin accused Clursky of making phone calls which he did not make show a constitutional violation.  *See* Bender v. Brumley, 1 F.3d 271, 274 n.3 (5th Cir. 1993); McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983).  These claims are without merit as well.

More pertinently, however, Clursky has failed to show a viable retaliation claim because he has not met the elements of a retaliation claim as set out by the Fifth Circuit.  He simply speculates that Rollins' search of his locker in August was related to the incidents concerning his boots which took place in May, but offers no facts in support of this theory.  He has not presented a chronology of events from which retaliation may plausibly be inferred.  Nor has Clursky shown that but for the alleged retaliatory motive, the action complained of would not have occurred.  Instead, as his testimony at the Spears hearing made clear, his claim consists of little more than his personal opinion that he was the victim of retaliation.  Clursky's claim on this point is without merit.

Nor has Clursky shown that Godwin's conduct was related in any way to his complaints about his footwear, or that but for the alleged retaliatory motive, the actions by Godwin about which he complains would not have occurred.  Clursky's retaliation claim against Godwin is without merit.

Clursky's complaint may be read to raise general retaliation claims against Stinson, Wilson, Yarbrough, and Watson.  However, as above, Clursky offers no specific facts in support of his retaliation claims, nor does he present a chronology from which retaliation may plausibly be inferred. The Fifth Circuit has held that  (claims of retaliation should be "regarded with skepticism" and must be "carefully scrutinized" to ensure that prisoners do not "inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves").  Woods v. Smith, 60 F.3d at 1166; *see also* Henderson v. Eason, 37 Fed.Appx. 92 (5th Cir., May 17, 2002) (not selected for publication in the Federal Reporter) (citing Jones v. Greninger and stating that the plaintiff "has

not produced evidence of a retaliatory motive, nor has he established a chronology of events from which retaliation by [the defendants] can be plausibly inferred ... [the plaintiff's] personal beliefs and conclusial allegations are insufficient to establish a claim for retaliation"); Blanton v. Stacks, 136 Fed.Appx. 715 (5th Cir, June 29, 2005) (not selected for publication in the Federal Reporter) (citing Jones v. Greninger and Johnson v. Rodriguez and stating that "the plaintiff has not alleged a series of events from which a plausible retaliation claim could be gleaned, nor has he offered evidence of a direct retaliatory motive ... Rather, his retaliation claims are based on his own personal beliefs and conclusial assertions, which are insufficient to raise a viable retaliation claim.") As in these cases, Clursky's retaliation claims are based on his own personal beliefs and conclusial assertions, and do not support a viable Section 1983 claim.

To the extent that Clursky sues Neva Yarbrough because of her position as warden, saying that it was "her job to see that he had proper footwear," his claim is without merit.  The Fifth Circuit has held that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases.  Williams v. Luna, 909 F.2d 121 (5th Cir. 1990).  A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation.  Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987). Clursky has failed to show any basis for supervisory liability on the part of Warden Yarbrough and his claim against her on this basis is without merit.

Finally, Clursky sues Dr. James Gray, complaining that Dr. Gray did not inspect his boots to find out what chemical had been used to sanitize them and did not help him to get new boots, but only gave him foot cream.  He says that this was a "denial of professional medical help."

The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not.

Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989).  However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim.  Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991).  Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action.  Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993).  The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs.  Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs.  Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985).  It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later.  The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet.  It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.  Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment."  Estelle v. Gamble, 429 U.S. 97, 107 (1972).  And, "the failure to alleviate a significant risk that [the official] should

14

have perceived, but did not," is insufficient to show deliberate indifference.  Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756; *see also* Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

In this case, Clursky has failed to show that Dr. Gray refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct evincing a wanton disregard for any serious medical needs.  Instead, the medical records show that Clursky was diagnosed with a minor case of athlete's foot, involving only a slight scaling on his foot with no redness, open areas, or drainage.  Treatment was given for this condition in the form of anti-fungal cream, the standard treatment.[2]  The fact that Dr. Gray did not undertake the investigative work which Clursky thought appropriate is not indicative of deliberate indifference.

In addition, it is questionable whether Clursky's minor case of athlete's foot even qualifies as a serious medical need.  The Fifth Circuit has held that a serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required.  Gobert v. Caldwell, 463 F.3d 399, 345 (5th Cir. 2006).  Other courts have held that athlete's foot does not constitute a serious medical need.  *See* Russell v. Ohio Adult Parole Authority, civil action no. 1:06cv873 (S.D.Ohio, January 12, 2007) (unpublished) (available on WESTLAW at 2007 WL 129000); Rogers v. Allen County Jail, civil action no. 1:06cv139 (N.D.Ind., May 25, 2006) (unpublished) (available on WESTLAW at 2006 WL 1441092).  The record in this case shows that Clursky's infection was a relatively mild one, in that there was no redness, open areas, or drainage, but merely some scaling on his foot.  He has failed to show that Dr. Gray was deliberately indifferent to a serious medical need and so his claim on this point is without merit.

### Conclusion

---

[2]Athlete's foot is "a common fungal infection that affects many people at some time in their lives."  The treatment for mild conditions is an anti-fungal ointment.  *See* http://www.mayoclinic.com/health/athletes-foot/DS00317.

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory.  Neitzke v. Williams, 490 U.S. 319, 325-7 (1989).  A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989), citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); see also Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Clursky's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted.  Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b).  See generally Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous.  28 U.S.C. §1915A(b).  It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **15** day of **January, 2008.**

_____

JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE

16